IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Valerie L. Reaves, | ) | C/A No.: 1:13-625-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

# I.    Relevant Background

## A.    Procedural History

On August 26, 2008, Plaintiff filed an application for DIB in which she alleged her disability began on August 10, 2007.[1]  Tr. at 230–32.  Plaintiff later amended her disability onset date to June 26, 2008.  Tr. at 20, 347.  Her application was denied initially and upon reconsideration.  Tr. at 85–88.  On July 8, 2010, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss.  Tr. at 31–56 (Hr'g Tr.).  The ALJ issued an unfavorable decision on September 24, 2010, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 89–105.  On November 4, 2011, the Appeals Council granted Plaintiff's request for review of the ALJ's decision, remanded the case to the ALJ, and ordered him to: (1) give further consideration to Plaintiff's self-reported earnings during the relevant period; (2) give further consideration to the residual functional capacity ("RFC"), evaluate treating and non-treating source opinions, and request additional information when necessary; and (3) obtain testimony from a vocational expert.  Tr. at 106–09.

The ALJ held a second hearing on May 25, 2012.  Tr. at 57–84.  In a decision dated July 17, 2012, the ALJ again found that Plaintiff was not disabled under the Act.  Tr. at 20–30.  On December 7, 2012, the Appeals Council granted Plaintiff's request for review.  Tr. at 9–12.  The Appeals Council issued an unfavorable decision on January 28, 2013.  Tr. at 1–6.  In its decision, the Appeals Council agreed with the ALJ's findings, but noted that he erred in failing to consider the deposition of vocational expert ("VE")

---

[1] Plaintiff also filed an application for Supplemental Security Income, but her application was denied because her income was too high.  Tr. at 111–18, 218–22.

Benson Hecker.  Tr. at 5.  The Appeals Council accorded Dr. Hecker's opinion no weight and affirmed the ALJ's finding of non-disability.  Tr. at 5–6.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 8, 2013.  [Entry #1].

  B. Plaintiff's Background and Medical History

   1. Background

Plaintiff was 38 years old at the time of the second hearing.  Tr. at 60.  She completed high school and three years of college.  Tr. at 34.  Her past relevant work ("PRW") was as an operations supervisor at a transportation company.  Tr. at 79.  She alleges she has been unable to work since June 26, 2008.  Tr. at 20, 347.

   2. Medical History

Plaintiff stopped working in June 2008.  Tr. at 489.  On July 11, 2008, Plaintiff's primary care physician Keith W. Lackey M.D., noted that Plaintiff was suffering from mood swings, depressed mood, and problems sleeping.  Tr. at 478.

Plaintiff first saw treating psychiatrist, Susan S. Crocker, M.D., on August 6, 2008.  Tr. at 489–91.  Plaintiff reported leaving a stressful job working with her family and staying in bed for one week after quitting.  Tr. at 489.  She felt like she had a physical and mental breakdown in June 2008.  *Id.*  Dr. Crocker noted that Plaintiff had fair concentration, intact memory, appropriate thought content and process, and normal speech, but was fidgety and exhibited a depressed and anxious mood.  Tr. at 490.  Dr. Crocker prescribed medications to treat anxiety, a mood disorder, recurrent depression, sleep difficulties, and mood swings.  Tr. at 491.

On September 8, 2008, Plaintiff reported low energy, feelings of fatigue, and worsening anxiety. Tr. at 486. On September 24, 2008, Dr. Crocker noted that Plaintiff's mood was mildly dysthymic, she continued to have moderate anxiety around people, her mood cycling was better, but still present, and she was sleeping better. Tr. at 494.

Plaintiff returned to Dr. Crocker on October 23, 2008. Tr. at 560. She reported low energy, jaw clenching, frequent panic attacks, no mood swings, and mild depression. *Id.* Dr. Crocker diagnosed bipolar disorder. *Id.* On November 17, 2008, Plaintiff reported feeling sluggish and sedated. Tr. at 558.

On December 4, 2008, Plaintiff reported to Dr. Crocker that her mood swings were worse and that, she was more depressed and anxious. Tr. at 557. Dr. Crocker noted that Plaintiff had gotten medication directions wrong on several occasions. *Id.* A few days later, Plaintiff reported that her mood swings had decreased, her depression symptoms were mild, and her anxiety symptoms had improved, but she was still avoiding social interactions. Tr. at 556.

By letter dated January 6, 2009, Dr. Crocker explained that Plaintiff's anxiety symptoms were still problematic given her mood disorder and psychosocial stressors despite treatment with benzodiazepines. Tr. at 629. She stated that she treated Plaintiff as having anxiety and bipolar disorders. *Id.* Dr. Crocker described Plaintiff's medication regimen as being complex and including a mood stabilizer, two antidepressants, one antipsychotic, and one anxiolytic medicine. *Id.* Dr. Crocker ultimately concluded that

4

"[d]ue to ongoing instability of her mood, moderate anxiety symptoms, and periodic adverse medication side effects, [Plaintiff] is not stable enough to work at this time." *Id.*

On January 7, 2009, Plaintiff reported that her mood swings and depression were better, but that she continued to have sleep problems and moderate to severe anxiety, worried excessively, and avoided the public. Tr. at 554.

On March 24, 2009, Dr. Crocker noted that Plaintiff's mood was primarily euthymic with mild intermittent dysthymia breakthrough and that she was generally sleeping well and had less severe panic attacks about five times per month. Tr. at 628. Plaintiff stated that she felt she was more stable emotionally, but was in physical pain on a daily basis because of her fibromyalgia and degenerative joint disease. *Id.*

Plaintiff was in a car accident on May 29, 2009. Tr. at 626. On June 25, 2009, Dr. Crocker noted that the accident had traumatized Plaintiff, causing worse sleep and exacerbated anxiety symptoms. *Id.*

On October 7, 2009, Plaintiff reported feeling more depressed, anxious, and guilty because she could not work. Tr. at 624. Dr. Crocker noted that Plaintiff was easily agitated and felt sluggish and overmedicated. *Id.* On January 6, 2010, Plaintiff reported that Prozac had helped her mood, but she still had some breakthrough depression. Tr. at 623. She also reported decreased energy, poor sleep, and no significant mood swings. *Id.* Plaintiff continued to treat with Dr. Crocker through May 2011. Tr. at 690–95. During these visits, Plaintiff continued to report depression, mild to moderate anxiety, variable sleep, and variable energy. *Id.* Plaintiff's global assessment of functioning

("GAF")[2] scores throughout her treatment with Dr. Crocker ranged from 55 to 65. Tr. at 486–94, 554–60, 623–28, 690–95.

On July 19, 2010, Dr. Crocker denied Plaintiff's counsel's request to complete a Treating Psychiatrist's Statement and Mental Residual Functional Capacity ("RFC") Statement. Tr. at 661. Dr. Crocker noted that she did not do evaluations of functional capacity and suggested Plaintiff seek out a disability evaluator such as Dr. Gordon Teichner. *Id.*

Dr. Teichner conducted a consultative neuropsychological evaluation in August 2010. Tr. at 662. As part of the evaluation, Dr. Teichner reviewed Plaintiff's psychiatric and medical records, psychiatric medications, psychiatric history, vocational history, and administered a battery of neuropsychological tests. Tr. at 662–64. Plaintiff reported that her only job had been with her family's trucking company and that she probably would have been fired many times over the years if she had been working for someone other than her parents. Tr. at 663. She stated she threw frequent tantrums at work where she would scream, yell, and act out, and that she often had panic attacks. *Id.* On examination, Dr. Teichner noted that Plaintiff was alert and oriented, organized in her thoughts, fidgety, anxious, depressed, and sad. Tr. at 665. She exhibited intact memory and fair judgment. *Id.* Testing revealed that Plaintiff demonstrated average intellectual abilities, average language abilities, severe deficits of visual focused attention, inconsistent and erratic reaction time indicative of inattention and problematic

---

[2] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

information processing speed, and excessive errors of commission indicating problematic impulsivity.  Tr. at 668–69.

Based on his evaluation of Plaintiff, Dr. Teichner diagnosed bipolar disorder, generalized anxiety disorder, panic disorder with agoraphobia, social phobia, attention deficit/hyperactivity disorder not otherwise specified, and victim of childhood physical and sexual abuse by history.  Tr. at 671.  He assessed her with a GAF score of 40, noted that she demonstrated a poorly-controlled bipolar disorder, and stated that her psychological assessment revealed a severe mental illness that involved both affective and anxiety disorders.  *Id.*  Dr. Teichner concluded that Plaintiff did not have the capacity to gain and maintain meaningful employment due to the cumulative negative effects of her poorly-controlled psychiatric conditions and personality pathology.  Tr. at 672.  He agreed with Plaintiff that the only reason that she was able to maintain employment for as long as she did was because she was working for her parents.  *Id.*  He noted that any other employer would have certainly fired her years ago.  *Id.*

Dr. Teichner also completed an Examining Psychologist's Statement in which he opined that Plaintiff met the paragraph A, B, and C criteria for Listings 12.04 and 12.06. Tr. at 675–79.   He opined that Plaintiff had marked restriction of ADLs; extreme difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation, each of an extended duration.  Tr. at 678.

On December 6, 2010, Dr. Crocker wrote a letter to Plaintiff's counsel stating that Plaintiff's diagnoses were "consistent with those given by Dr. Teichner in his extensive evaluation done in August 2010." Tr. at 689.

In January and February 2012, Plaintiff began seeing therapist Nancy D. Wington, LPC, and psychiatrist Paul I. Robbins, M.D. Tr. at 711–14. At the initial visit, Plaintiff reported low energy, low sleep, anhedonia, poor concentration, easy distractability, racing thoughts, and high anxiety. Tr. at 713. She was observed to have a depressed and anxious mood, tearfulness, flat or congruent affect, poor insight, and poor judgment. *Id.* Dr. Robbins's initial assessment of Plaintiff on February 24, 2012, was bipolar affective disorder and panic disorder with agoraphobia, and he wanted to rule out post-traumatic stress disorder. Tr. at 711. Dr. Robbins assigned a GAF score of 50 and adjusted Plaintiff's psychiatric medications. *Id.* Subsequent treatment and counseling notes through May 2012 continued to show tearfulness on examination and showed that Dr. Robbins continued to adjust Plaintiff's medications. Tr. at 707–10, 715.

At the request of Plaintiff's counsel, Dr. Robbins drafted an opinion letter dated May 22, 2012. Tr. at 717–19. Dr. Robbins noted that he had reviewed Dr. Crocker's letter dated December 6, 2010, and Dr. Teichner's opinions from August 2010. Tr. at 718. Dr. Robbins stated that he agreed with Dr. Teichner's mental RFC assessment and stated that he saw no improvement in Plaintiff's ability to function in a work-related environment. Tr. at 718–19. He noted that Plaintiff was having much difficulty functioning even in her home environment. Tr. at 719.

8

Over the course of the time period at issue in this appeal, Plaintiff also received treatment, underwent studies, and was prescribed medications for her physical impairments by gastroenterologists (Tr. at 457, 465–76, 496–521, 654–60, 696–700), neurologist Harnid R. Bahadori, M.D. (Tr. at 643–53), and rheumatologist Gregory Niemer, M.D. (Tr. at 564–74, 630–42, 701–06).   A gastrointestinal emptying study performed on June 6, 2007, was found abnormal (Tr. at 457, 470) and gastroenterologist Todd E. Dantzler, M.D., diagnosed Plaintiff with gastroparesis (Tr. at 659–60).   Dr. Bahadori's notes from July 2009 to January 2010 showed that Plaintiff was treated for complaints of neck and back pain and spasms.  Tr. at 643–53.  She was assessed with cervical radiculolpathy, neck spasm, neck dystonia, and occipital headache.  Tr. at 644, 646, 653.  However, MRI and EMG studies came back negative.  Tr. at 646, 648–50.

Dr. Niemer wrote two type-written letters to Dr. Crocker.  In a letter dated March 3, 2009, Dr. Niemer indicated that Plaintiff's physical examination was notable for multiple trigger points and decreased range of motion.  Tr. at 642.  He noted that Plaintiff's symptoms seemed to be related to a combination of degenerative disc disease of the lumbar spine and fibromyalgia.  *Id.*  In a letter dated August 31, 2009, Dr. Niemer noted that Plaintiff continued to have marked symptoms secondary to her fibromyalgia, along with great difficulty sleeping.  Tr. at 632.

C.     The Administrative Proceedings

1.     The First Administrative Hearing

At the hearing on July 8, 2010, Plaintiff stated that she lived with her husband and two children.  Tr. at 35.  She reported having a long history of social anxiety (Tr. 53) and

that she had been on antidepressant and anti-anxiety medication since her twenties (Tr. at 38). She said that after attending three years of college, she started working at her parents' business. Tr. at 50–51. Plaintiff testified that before she quit working, she was having panic attacks at work, having frequent mood swings, and could not handle stressors in the office. Tr. at 37. She stated that her job was very high stress and that another employer would not have tolerated her flying off the handle, screaming, throwing fits, and walking out of the office. Tr. at 38–39. She said her parents allowed her to go to another room to cool down or go home for the day. Tr. at 39. She stated that she stopped working after getting into what should have been a minor disagreement with her brother, but which escalated into her walking off the job and not speaking to her family for a month. Tr. at 40.

Plaintiff testified that although her medications had improved her mood swings, she continued to have panic attacks. Tr. at 40–41. She said she sometimes had to take extra medication to feel comfortable, but that the medication caused her thinking to become cloudy, slowed her reaction time, and affected her memory. Tr. at 41. She testified that she spent about 80 percent of her time in her bedroom. Tr. at 42. She stated that she left the house once or twice a week to go to dinner or visit family and shopped when the grocery store was not busy. Tr. at 43–44.

Plaintiff testified to gastrointestinal issues as well as difficulty sleeping. Tr. at 46–48. She said she had low energy during the day and spent five or six hours resting during normal work hours. Tr. at 48. She reported being involved in a car accident in May 2009 and stated that she had headaches and neck pain sporadically since then. Tr. at 49.

### 2.    The Second Administrative Hearing

#### a.    Plaintiff's Testimony

At the hearing on May 25, 2012, Plaintiff testified that she was no longer seeing Dr. Crocker because she did not have enough money for the appointments; however, she had begun seeing Dr. Robbins.  Tr. at 62.   She said that her mental state had worsened since the last hearing.   Tr. at 64.   She stated that her gastroparesis caused her to experience bloating, severe cramping, and vomiting four or five times per week.  *Id.*  She testified that the medications she took to address these symptoms made her groggy and unable to do anything except sleep.  Tr. at 65.  She stated that she was highly fatigued during the day because she slept four to six hours per night, woke up a lot, and had a lot of difficulty falling asleep.  Tr. at 65–66.  She described her level of chronic pain as a seven out of 10.  Tr. at 67.  She said she spent about 75 percent of an average day in her room and 40 to 50 percent of the day resting.  Tr. at 68.  She stated that she cooked some, made the beds, unloaded the dishwasher, and attended her children's games, but had to sit to the side with long-time friends.  Tr. at 69, 73.

#### b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur Schmitt reviewed the record and testified at the hearing.  Tr. at 78.  The VE categorized Plaintiff's PRW as an operations supervisor at a transportation company as skilled, sedentary work.  Tr. at 79.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to understanding, remembering, and carrying out simple instructions; was able to tolerate occasional interaction with supervisors and coworkers; and should be limited to no direct contact

with the public. *Id.* The VE testified that the hypothetical individual would not be able to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified the jobs of janitor, laundry operator, and egg packer. Tr. at 79–80. The ALJ then asked the VE to include the additional limitation of a 20 percent loss of productivity due to concentration deficits. Tr. at 80. The VE testified that such a limitation would preclude all work in the national economy. *Id.*

Plaintiff's attorney asked the VE questions regarding Dr. Hecker's testimony. Tr. at 80–82. The VE agreed that a hypothetical individual with moderate difficulty interacting with coworkers, supervisors, and the general public, and moderate difficulty responding to the usual demands of work (where moderate was defined as more than one-third of the day) would be precluded from all work. Tr. at 81. The VE also agreed that the cumulative effect of the marked and moderate limitations opined by Dr. Teichner would preclude all work. Tr. at 82.

3.     The ALJ's Findings

In his decision dated July 17, 2012, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2.   The claimant has not engaged in substantial gainful activity since June 26, 2008, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
3.   The claimant has the following severe impairments: bipolar disorder, gastrointestinal problems, and headaches (20 CFR 404.1520(c)).
4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to understanding, remembering, and carrying out simple instructions.  She is able to tolerate occasional interaction with supervisors and coworkers but is limited to no direct contact with the public.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on October 28, 1973 and was 33 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 26, 2008 through the date of this decision (20 CFR 404.1520(g)).

Tr. at 22–30.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ erred in his consideration of the opinion evidence;

2)     the Appeals Council erred in rejecting the opinion of Dr. Hecker;

3)     the ALJ erred in failing to find Plaintiff's anxiety disorder and fibromyalgia to be severe impairments; and

4)     the ALJ performed an improper credibility analysis.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

14

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v.*

---

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Physician Opinions

Plaintiff first asserts that the ALJ and Appeals Council improperly rejected the opinions of her treating physicians, Drs. Crocker and Robbins, and her consulting examiner, Dr. Teichner.  [Entry #14 at 23–34].  Plaintiff further asserts that the ALJ improperly based his RFC assessment on the opinions of the state-agency consultants. *Id.* at 30.  Within Plaintiff's argument regarding the opinion evidence, she also challenges the ALJ's Listing analysis.  That argument is addressed separately below.

a.    Treating Physicians

If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.  SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).  The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(c)(2).  However,

"the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking a review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because the court's role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

### 1)    Dr. Crocker's Opinions

Dr. Crocker offered two opinions related to her treatment of Plaintiff. On January 6, 2009, Dr. Crocker opined that "[d]ue to ongoing instability of her mood, moderate anxiety symptoms, and periodic adverse medication side effects, [Plaintiff] is not stable enough to work at this time." Tr. at 629.

With regard to this opinion, the ALJ stated that although he accorded Dr. Crocker's records great weight, he gave the opinion little weight because it was unsupported by clinical findings and observations. Tr. at 28. The ALJ found that while the claimant had some difficulty interacting and dealing with stress, mental status

examinations were generally normal and records did not reflect the level of severity that would preclude Plaintiff from all work activity. *Id.* The ALJ noted that he accounted for Plaintiff's anxiety symptoms in the RFC. *Id.*

Plaintiff challenges the ALJ's characterization of the mental status examinations as "generally normal" and contends the ALJ ignored substantial medical evidence in the record that contradicted this finding. [Entry #23 at 3]. The Commissioner cites to evidence reflecting a mild and/or improving condition and normal mental status examinations to support the ALJ's finding. [Entry #16 at 8–9].

A review of Dr. Crocker's medical records prior to the January 2009 opinion reveal that he was treating Plaintiff for anxiety, mood disorder, recurrent depression, sleep difficulties, and mood swings. Tr. at 491. Plaintiff's symptoms related to these conditions fluctuated. While Dr. Crocker noted improved depression and mood swings at some visits (*see, e.g.*, Tr. at 486 ("cycling" was slightly decreased); 554 (mood swings and depression better); 556 (mood swing decreased); 560 (no mood swings and mild depression)), she indicated Plaintiff had constant or worsening symptoms at others (*see, e.g.*, Tr. at 486 ("still moderately depressed"); 556 (mild daily depression); 557 (mood swings and depression worse)). Plaintiff's anxiety level also fluctuated (*see, e.g.*, Tr. at 486 ("anxiety worse"); 554 (anxiety still moderately severe, avoiding public, intermittent panic attacks); 556 (anxiety symptoms better, but still engaging in social avoidance); 557 (severe anxiety over disability denial); 558 (three panic attacks in prior week); 560 (decreased frequency of panic attacks)). Dr. Crocker also noted that Plaintiff felt "sluggish and sedated," and looked "overmedicated." Tr. at 558. On examination,

Plaintiff's mood was usually depressed and/or anxious.  Tr. at 486, 490, 554, 557–58, 560.

Dr. Crocker based her opinion on the "ongoing instability of [Plaintiff's] mood, moderate anxiety symptoms, and periodic adverse medication side effects."  Tr. at 629. Her reasons are borne out by the foregoing summary of her treatment notes.  The ALJ's reasons for discounting Dr. Crocker's opinion are vague and unspecific.  For these reasons, the undersigned is unable to find that the ALJ's decision to discount Dr. Crocker's opinion is supported by substantial evidence.  Therefore, the undersigned recommends remand with a directive to the ALJ to give further consideration to Dr. Crocker's January 2009 opinion.

On December 6, 2010, Dr. Crocker wrote a letter to Plaintiff's counsel stating that her diagnoses were "consistent with those given by Dr. Teichner in his extensive evaluation done in August 2010."  Tr. at 689.  The ALJ accorded this opinion little weight because it did not indicate if Dr. Crocker believed Plaintiff was as limited as Dr. Teichner concluded.  Tr. at 28.  The ALJ noted that Dr. Teichner's opinions was not supported by Dr. Crocker's records, which indicated that Plaintiff was "doing well," had normal mental status examinations, denied medication side effects, and had GAF scores in the 60s.  *Id.*

The Commissioner argues that the ALJ did not err in his assessment of Dr. Crocker's December 2010 statement because Dr. Crocker commented on the diagnoses, rather than the limitations, assessed by Dr. Teichner.  [Entry #14 at 15–16].  A plain reading of Dr. Crocker's letter supports this argument.  Dr. Crocker states only that her

diagnoses were consistent with those of Dr. Teichner. Because those diagnoses are not in dispute, the undersigned finds no error in the ALJ's treatment of Dr. Crocker's letter of December 2010.

2)     Dr. Robbins's Opinion

At the request of Plaintiff's counsel, Dr. Robbins drafted an opinion letter dated May 22, 2012. Tr. at 717–19. Dr. Robbins noted that he had reviewed Dr. Crocker's letter dated December 6, 2010, and Dr. Teichner's opinions from August 2010. Tr. at 718. Dr. Robbins stated that he agreed with Dr. Teichner's mental RFC assessment and stated that he saw no improvement in Plaintiff's ability to function in a work-related environment. Tr. at 718–19. He noted that Plaintiff was having much difficulty functioning even in her home environment. Tr. at 719.

The ALJ accorded the opinion little weight, finding that the opinion was not supported by Dr. Robbins's own treatment records. Tr. at 28. The ALJ noted that mental status examinations from January to May 2012 "were normal, aside from a depressed mood and agitation" and that, prior to an altercation with her mother, Plaintiff had reported that her anxiety and mood were improving. *Id.* The ALJ stated that because Dr. Robbins had only been treating Plaintiff for three months, it was more likely that he accepted Dr. Teichner's findings rather than making his own determination. *Id.*

The undersigned agrees with Plaintiff that the ALJ's finding that Dr. Robbins accepted Dr. Teichner's findings rather than making his own determination is pure speculation. However, the ALJ's interpretation of Dr. Robbins's treatment notes is consistent with the undersigned's review. In addition, the ALJ's decision notes the short

21

treatment relationship between Plaintiff and Dr. Robbins. The undersigned finds the ALJ's reasons for discounting the opinion of Dr. Robbins to be sufficiently specific. Nevertheless, the undersigned recommends that, on remand, the ALJ be directed to assess Dr. Robbins's opinion based solely on facts rather than speculation.

### b.    Dr. Teichner's Opinion

Plaintiff also challenges the ALJ's treatment of Dr. Teichner's opinion. Plaintiff concedes that Dr. Teichner is a consulting, rather than treating, physician, but argues that his opinion still should have been accorded great weight because it was well supported by the evidence, well explained, and concurred with by the treating physicians. [Entry #24 at 40].

Because Dr. Teichner is a consulting physician, his opinion must be reviewed in accordance with 20 C.F.R. § 404.1527(c), but is not entitled to the greater weight typically afforded to the opinions of treating physicians. The factors to consider in assessing the opinion include, but are not limited to: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson*, 434 F.3d at 654.

Dr. Teichner conducted a consultative neuropsychological evaluation in August 2010. Tr. at 662. As part of the evaluation, Dr. Teichner reviewed Plaintiff's psychiatric and medical records, psychiatric medications, psychiatric history, vocational history, and administered a battery of neuropsychological tests. Tr. at 662–64. Dr. Teichner noted

that testing revealed that Plaintiff demonstrated average intellectual abilities, average language abilities, severe deficits of visual focused attention, inconsistent and erratic reaction time indicative of inattention and problematic information processing speed, and excessive errors of commission indicating problematic impulsivity.  Tr. at 668–69.  Based on his evaluation of Plaintiff, Dr. Teichner diagnosed bipolar disorder, generalized anxiety disorder, panic disorder with agoraphobia, social phobia, attention deficit/hyperactivity disorder not otherwise specified, and victim of childhood physical and sexual abuse by history.  Tr. at 671.  He assessed her with a GAF score of 40, noted that she demonstrated a poorly-controlled bipolar disorder, and stated that her psychological assessment revealed a severe mental illness that involved both affective and anxiety disorders.  *Id.*  Dr. Teichner concluded that Plaintiff did not have the capacity to gain and maintain meaningful employment due to the cumulative negative effects of her poorly-controlled psychiatric conditions and personality pathology.  Tr. at 672.  He agreed with Plaintiff that the only reason that she was able to maintain employment for as long as she did was because she was working for her parents.  *Id.*  He noted that any other employer would have certainly fired her years ago.  *Id.*

Dr. Teichner also completed an Examining Psychologist's Statement in which he opined that Plaintiff met the A, B, and C criteria for Listings 12.04 and 12.06.  Tr. at 675–79.  He opined that Plaintiff had marked restriction of ADLs; extreme difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation, each of an extended duration.  Tr. at 678.

The ALJ accorded Dr. Teichner's opinions little weight. Tr. at 28. He found that the opinions were not supported by Dr. Teichner's clinical findings, which the ALJ characterized as "relatively benign." *Id.* Dr. Teichner assigned Plaintiff a GAF score of 40, but the ALJ noted that "even the claimant's representative acknowledged that GAF scores are too subjective." *Id.* With regard to Dr. Teichner's finding that Plaintiff was only able to maintain employment because she was working in her family's business, the ALJ cited Plaintiff's testimony that it was more stressful working for her family and she did not speak to her family for a month after she quit her job. *Id.* The ALJ found that many of Plaintiff's problems seemed to be the result of high stress and additional duties at her job. *Id.*

Plaintiff asserts that in characterizing Dr. Teichner's opinions as "relatively benign," the ALJ impermissibly substituted his lay opinion for that of a medical expert. [Entry #23 at 8, 10]. Although an ALJ is free to accept or reject all or part of an opinion regarding a claimant's medical condition, he is not free to simply disregard uncontradicted expert opinions in favor of his own opinion on a subject he is not qualified to render. *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984) (finding ALJ erroneously "exercised an expertise he did not possess" by discounting orthopedist's conclusions regarding claimant's functional limitations); *see also Gibson v. Astrue*, C/A 2:10-40, 2011 WL 587170, at *6 (W.D. Va. Feb. 10, 2011) (recommending remand when ALJ disregarded uncontradicted psychological opinion).

Here, Dr. Teichner obtained a thorough history from Plaintiff, conducted an extensive battery of psychological testing, and offered opinions based on his

examination. He documented his findings in a 12-page report. Tr. at 662–73. He also completed an evaluation of whether Plaintiff satisfied the diagnostic criteria for Listings 12.04 and 12.06. Tr. at 674–80. The findings in Dr. Teichner's report are uncontradicted by other opinion evidence. While his opinions regarding the diagnostic criteria are contradicted by the opinions of the state-agency consultants, the consultants' opinions were rendered based on a limited review of the medical records and without the benefit of any psychological testing (discussed in greater detail below).

Based on the foregoing, the undersigned recommends finding that the ALJ erred in characterizing Dr. Teichner's opinions as "relatively benign" without explanation and without testimony or opinions to the contrary. Because the ALJ's decision to discount the opinions was based almost entirely on his finding that they were relatively benign and he failed to consider the factors set forth in 20 C.F.R. § 404.1527(c), the undersigned recommends a finding that the ALJ's decision to discount Dr. Teichner's opinions is not supported by substantial evidence and does not comply with the applicable legal standards. The undersigned further recommends that this matter be remanded to the ALJ for further consideration of Dr. Teichner's opinions in accordance with the factors set forth in 20 C.F.R. § 404.1527(c).

### c. Opinions of State-Agency Consultants

The record contains psychiatric review technique ("PRT") forms and mental RFC assessments from two state-agency consultants. On November 12, 2008, Michael Neboschick, Ph.D., opined that Plaintiff had mild restriction of her ADLs; moderate difficulty in maintaining social functioning; mild difficulty in maintaining concentration,

persistence, or pace; and no episodes of decompensation. Tr. at 534–47. He further opined that Plaintiff could understand, remember, and implement simple instructions; may miss some work days due to her combined physical and mental conditions; and would work best in an environment that is not fast paced and does not involve direct contact with the public. Tr. at 550. Dr. Neboschick noted that he had only reviewed the records of four of Plaintiff's visits with Dr. Crocker (Tr. at 546) and that Plaintiff had only recently begun a comprehensive medication approach to treating her psychiatric symptoms (Tr. at 550).

Approximately four months later, Judith Von, Ph.D., completed a PRT and mental RFC assessment. Tr. at 583–600. Dr. Von's opinion was consistent with that of Dr. Neboschick except that Dr. Von opined that Plaintiff had no restriction of her ADLs. Tr. at 593, 599.

The ALJ accorded the opinions of the state-agency consultants great weight because he found their opinions were generally consistent with the other evidence of record. Tr. at 27. Plaintiff argues the ALJ's reliance on the state-agency opinions was in error because the opinions were based on a limited review of her medical records, without the benefit of a psychological evaluation, and without having reviewed the opinions of the treating and examining physicians. [Entry #14 at 31]. The undersigned agrees. The state-agency consultants rendered their opinions based on a very limited scope of medical records and prior to the issuance of the opinions of the treating and examining doctors. Tr. at 546, 595. The undersigned is unable to reconcile the ALJ's decision to accord these limited opinions great weight, while according the opinions of

Plaintiff's examining and treating physicians little weight. Consequently, the undersigned recommends remand for further evaluation of the opinion evidence in this matter.

### 2.    Listing Analysis

Plaintiff also argues that the ALJ's Listing analysis is not supported by substantial evidence because he failed to consider all relevant evidence in assessing whether Plaintiff satisfied the criteria found in paragraphs B and C of Listings 12.04 and 12.06. [Entry #14 at 26–29].

In assessing the paragraph B criteria, the ALJ made specific findings regarding Plaintiff's restriction of ADLs; social functioning; and concentration, persistence, and pace. Tr. at 23–24. However, in making those findings, he relied solely on Exhibit 10E (Tr. at 326–33), a Function Report dated March 5, 2009. *Id.* The ALJ failed to acknowledge any treatment notes or medical opinions relevant to his analysis. For example, based on a much more complete record than that reviewed by the state-agency consultants, Dr. Teichner rendered an opinion regarding Plaintiff's restrictions under paragraph B of the relevant Listings. He also documented Plaintiff's low scores on testing related to her ability to maintain concentration, persistence, and pace. Dr. Crocker's notes are likewise relevant to the ALJ's Listing analysis in that they document problems in social functioning. Because the ALJ's analysis is based only on Plaintiff's self-reported functionality, the undersigned recommends a finding that the ALJ's analysis of whether Plaintiff satisfied the paragraph B criteria is not supported by substantial evidence.

The ALJ's consideration of whether Plaintiff satisfied the paragraph C criteria is similarly lacking.  At step three, the ALJ stated, without any explanation, that he had considered whether the paragraph C criteria were satisfied and found that the evidence failed to establish the presence of those criteria.  Tr. at 24.  The undersigned recommends a holding that such conclusory findings are insufficient, particularly in this case where Dr. Teichner had rendered an opinion that Plaintiff satisfied the paragraph C criteria.

Based on the foregoing, the undersigned recommends remanding this matter to the ALJ for further consideration of whether Plaintiff's impairments satisfy Listings 12.04 and 12.06.

### 3.    Remaining Allegations of Error

In light of the foregoing recommendations related to the ALJ's failure to properly consider the opinion evidence and perform a proper Listing analysis, Plaintiff's remaining allegations of error are not addressed.  On remand, however, the undersigned recommends directing the ALJ to evaluate Dr. Hecker's opinion and provide greater explanation for its treatment than that provided by the Appeals Council; re-evaluate whether Plaintiff's fibromyalgia and anxiety constitute severe impairments; and perform a credibility analysis that is in compliance with the applicable regulations and adequately addresses Plaintiff's concerns related to the reasons originally offered by the ALJ for discounting her credibility.

### 4.    Reversal v. Remand

The court is concerned that, nearly six years after her initial application, Plaintiff's disability petition remains unresolved due to the Commissioner's errors.  Nonetheless,

despite the repeated errors and resulting delay, the undersigned concludes that the circumstances of this case do not justify outright reversal. *See, e.g., INS v. Ventura*, 537 U.S. 12, 16 (2002) (stating that, when a court sitting in an appellate capacity reverses an administrative agency decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted); *Hall v. Harris*, 658 F.2d 260, 266 (4th Cir. 1981) (holding that remand for further proceedings is generally the proper remedy when an administrative law judge errs in evaluating a social security claimant's residual functional capacity). This is, most critically, because it is not certain that Plaintiff is entitled to an award of benefits. *Cf. Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987) ("We are convinced . . . that if the matter were to be remanded to the Secretary for redetermination and the Secretary were to conclude again that [the plaintiff] was not disabled, his decision would not withstand judicial review."); *Miller v. Callahan*, 964 F. Supp. 939, 956 (D. Md. 1997) ("Where the record does not show substantial evidence supporting the denial of benefits under the correct legal standard, *and reopening the record would serve no useful purpose*, reversal rather than remand is appropriate") (emphasis added). Accordingly, the undersigned concludes that remand, rather than reversal with a directive to award benefits, is the proper course.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is

supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 3, 2014                                        Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).